# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

SUDDEN VALLEY SUPPLY, LLC,    )
    )
    )
    Plaintiff,    )
    )
    v.    )        No.4:13-CV-00053-JCH
    )
NEIL P. ZIEGMANN,    )
N.P.Z., Inc.    )
    )
    Defendants.    )

## MEMORANDUM AND ORDER

This matter is before the Court on Plaintiff/Counterclaim Defendant Sudden Valley Supply, LLC's ("Sudden Valley") Motion for Claim Construction, and Defendants/Counterclaimants Neil P. Ziegmann's ("Ziegmann") and N.P.Z., Inc.'s ("NPZ") Motion for Claim Construction. The motions have been fully briefed, a *Markman* hearing was held on February 21, 2014, and the motions are ready for disposition.

## BACKGROUND

On July 31, 2012, U.S. Patent No. 8,230,642 ("the '642 Patent"), entitled "Raccoon Trap," was issued to Ziegmann. ('642 Patent, ECF No. 51-4). According to the specification, "[v]arious types of traps have been commercially available for many years for use by fur trappers, such as raccoon traps. One of the most common types of raccoon traps includes a tubular body in which bait is inserted, with a trigger which is set and then tripped by a raccoon's paw when the raccoon tries to withdraw the bait from the tubular body." *Id.* col. 1, ll. 13-18. But, the specification teaches, the available traps suffered from several defects. Among these defects were: (1) "some raccoons escape the trap without setting off the trigger, due to the one-way

action of the trigger[;]" (2) "the wire loop anchor of [one such] trap cannot be pushed into hard or frozen ground, and cannot be anchored in a tree, wooden post or other solid structure[;]" and (3) other traps "cannot be used in water since the anchor is too short." *Id.* col. 1, ll. 25-31. The '642 Patent therefore sought to improve on prior art through the invention of a raccoon trap with a two-way trigger and a more suitable anchor. *Id.* col. 1, ll. 32-34.

Sudden Valley filed a complaint on January 10, 2013 against Ziegmann seeking a declaratory judgment that the '642 Patent "is invalid and is not infringed by Sudden Valley's manufacture and sale of certain animal traps." (SV Complaint, ECF. No. 1, ¶ 1). According to Sudden Valley, the complaint was necessary because Ziegmann sent a letter "asserting that Sudden Valley has infringed, and continues to infringe, the '642 Patent by making and selling" a raccoon trap called the "Coon Dagger: The Dog Proof Trap." *Id.*; (Ziegmann Letter, ECF No. 1-1).

After unsuccessfully mounting challenges to the existence of personal jurisdiction and proper venue, (Motion to Dismiss, ECF No. 11; Order Denying Motion to Dismiss, ECF No. 26), Ziegmann filed an answer to Sudden Valley's complaint on May 28, 2013. (First Answer and Counterclaim, ECF No. 28). In the same document, Ziegmann joined NPZ under Fed. R. Civ. P. 20(a), and Ziegmann and NPZ (collectively "NPZ") jointly filed a counterclaim against Sudden Valley. Included as Count I of the counterclaim is an allegation that Sudden Valley has infringed and continues to infringe the '642 Patent. (Counterclaim, ECF No. 28, ¶ 14). To aid in the claim construction step of this infringement action, the parties have each filed memoranda of proposed claim constructions, and each party has filed a response to the other's memorandum. (ECF Nos. 50, 51, 56, 57, 58).

The parties disagree over the proper interpretation of six terms: (1) "housing;" (2) "tubular;" (3) "on;" (4) "extending into the housing;" (5) "flat end" and "flat surface;" and (6) "selectively." These terms are used at various points in independent claims 1, 5, and 11, as well as in dependent claims 2, 3, 4, 10, 12, 15, and 17.

Claim 1 of the '642 patent is the broadest claim in the patent. It covers:

> A live trap for catching an animal, comprising:
> a **housing**;
> a latch **on** the **housing** having a **flat end** and a notch adjacent the **flat end**;
> a restraint **on** the **housing**;
> the latch being engageable with the restraint and the trigger being engageable with the **flat end** of the latch to hold the trap in a set position;
> the trigger being movable in opposite directions by the animal to disengage the **flat end** of the latch and thereby release the restraint from the set position to catch the animal's paw; the **flat end** of the latch disengaging the trigger for the unset position when the trigger is moved in one of the opposite directions by the animal's paw; and the notch releasing the trigger for the unset position when the trigger is moved in the other of the opposite directions by the animal's paw.

('642 Patent col. 3, ll. 52-67, col. 4, ll. 1-2) (emphasis added). Claim 2 is a dependent claim of Claim 1 and covers:

> The live trap of claim **1** wherein the trigger is pivotally mounted **on** the **housing** and has a lower end **extending into the housing** and an upper end engageable with the latch.

*Id.* col.4, ll. 3-5 (emphasis added). Claim 3, also dependent on Claim 1, covers:

> The live trap of claim **1** wherein the latch is pivotally mounted **on** the **housing** for movement between engaged and disengaged positions with the restraint.

*Id.* col. 4, ll. 6-8 (emphasis added). Claim 4, another claim dependent on Claim 1, covers:

> The live trap of claim **1** wherein the latch is pivotally mounted **on** the **housing** for movement between set and unset positions.

*Id.* col. 4, ll. 9-11 (emphasis added). Claim 5, an independent claim, covers:

An animal trap comprising:

a **tubular body** with a closed rearward end and an open forward end into which an animal can reach its paw;

a spring loaded restraint mounted **on** the body movable between open and closed positions;

a latch **on** the body to **selectively** engage the restraint and having an end with a **flat surface** and a notch adjacent the **flat surface**;

a trigger **on** the body to engage the **flat surface** of the latch so as to hold the restraint in the open position;

the trigger being movable in two directions by an animal reaching its paw into the **housing** and thereby disengaging the **flat surface** of the latch so as to release the restraint from the open position to the closed position to catch the animal's paw in the body; the **flat surface** disengaging the trigger for the closed position when the trigger is moved in one of the two directions by the animal's paw; and the notch releasing the trigger for the closed position when the trigger is moved in the other of the two directions by the animal's paw.

*Id.* col. 4, ll. 12-31 (emphasis added). Claim 10, which is dependent on Claim 5, covers:

The trap of claim 5 wherein the trigger includes a hook to retentively and releasably engage the **flat surface** of the latch, and whereby the hook releases over the end of the latch when the trigger is pulled and releases through notch when the trigger is pushed.

*Id.* col. 4, ll. 45-49 (emphasis added). Claim 11, another independent claim, covers:

An animal trap comprising:

a **tubular housing** with a closed rearward end and an open forward end into which an animal can reach its paw;

a spring loaded restraint mounted **on** the **housing** and movable between set and unset positions;

a latch pivotally mounted **on** the **housing** movable between set and unset positions;

a trigger pivotally mounted **on** the **housing** and **extending into the housing**;

the restraint being moved to the set position **extending into the housing** and the latch being moved to the set position for engagement by the trigger to maintain the latch and the restraint in the set positions;

the trigger being movable by the animal's paw both rearwardly and forwardly to disengage the trigger from the latch, and thereby release the latch and the restrain from the set positions, whereby the paw is caught in the **housing** by the restraint;

the latch including a **flat surface** to engage the trigger for the set
position and to disengage the trigger for the unset position when
the trigger is pulled forward by the animal's paw; and

the latch including a notch to release the trigger for the unset
position when the trigger is pushed rearwardly by the animal's
paw.

*Id.* col. 4, ll. 50-67, col. 5, ll. 1-7 (emphasis added). Claim 12, which is dependent on Claim 11,

covers:

> The animal trap of claim **11** wherein the trigger has an upper end to retentively,
> yet releasably, engage the **flat surface** of the latch.

*Id.* col. 5, ll. 8-10 (emphasis added). Claim 15, which is dependent on Claims 11, 12, and 13,

covers:

> The animal trap of claim **13** wherein the **flat surface** is adjacent an end of the
> latch, and the notch is adjacent the **flat surface**, such that the hook will
> release through the notch if the paw pushes the trigger and will release
> over the end of the latch if the paw pulls the trigger.

*Id.* col. 5, ll. 15-16, col. 6, ll. 1-3 (emphasis added). Claim 17, which is dependent on Claims 11

and 16, covers:

> The animal trap of claim **16** wherein the wire frame is mounted to an exterior
> portion of the **housing**, and has a loop **extending into the housing** for
> catching the paw.

*Id.* col. 6, ll. 6-8 (emphasis added).


## LEGAL STANDARDS GOVERNING CLAIM CONSTRUCTION

Claim construction is a matter of law reserved for the courts. *Markman v. Westview*

*Instruments, Inc.*, 517 U.S. 370 (1996). When determining the correct claim construction, the

Court follows the "bedrock principle" that the "claims of a patent define the invention to which

the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed.

Cir. 2005) (en banc) (internal quotations and citations omitted), *cert. denied*, 546 U.S. 1170

(2006). The words in the claim are "generally given their ordinary and customary meaning." *Phillips*, 415 F.3d at 1312 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention[.]" *Id.* at 1313 (citations omitted). The patentee may act as his own lexicographer, however, and give terms a meaning other than their ordinary meaning, so long as the special definition "is clearly stated in the patent specification or file history." *Vitronics*, 90 F.3d at 1582 (citations omitted).

The complexity and difficulty of claim construction will vary from case to case. *See Phillips*, 415 F.3d at 1314. "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id*; *see also Callicrate v. Wadsworth Mannufacturing, Inc.*, 427 F.3d 1361, 1367-68 (Fed. Cir. 2005). "In such circumstances, general purpose dictionaries may be helpful[,]" *id.*, provided, of course, that the definition in the general purpose dictionary is compatible with the use of the word in the patent. *Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1305 (Fed. Cir. 2005) (internal quotations and citations omitted). After all, regardless of complexity, claim construction always begins and ends with the words of a claim. *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115-16 (Fed. Cir. 2004).

In other cases, "determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art." *Phillips*, 415 F.3d at 1314. These cases often involve claim terms that do not have a readily apparent meaning and claim

terms that have been used idiosyncratically by a patentee. *Id.* In these more complex instances of claim construction, the interpreting court often must consult several sources in order to determine the proper construction. Courts are to look primarily to the "intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics*, 90 F.3d at 1582 (citation omitted). They may also look to "extrinsic evidence," meaning evidence that is not part of the record. *Phillips*, 415 F.3d at 1317. But extrinsic evidence "is less significant than the intrinsic record in determining the 'legally operative meaning of disputed claim language.'" *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004) (quoting *Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n*, 366 F.3d 1311, 1318 (Fed. Cir. 2004)).

The claims language itself provides "substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314 (citations omitted). Context, for example, can provide important clues about the meaning of certain words within the claim. *Id.* (explaining that term "'steel baffles' . . . strongly implies that the term 'baffles' does not inherently mean objects made of steel."). Similarly, because terms are "normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id.* (citations omitted).

Because claims are part of a "fully integrated written instrument[,]" they must "be read in view of the specification, of which they are a part." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978-79 (Fed. Cir. 1995) (citations omitted). The Federal Circuit has emphasized repeatedly that the specification "'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics*, 90 F.3d at 1582). The Court must not, however, import

limitations from the specification into the claim. *Phillips*, 415 F.3d at 1323. Interpreting courts therefore must walk a "fine line" between interpreting claims in light of the specification and improperly importing limitations from the specification. *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186-87 (Fed. Cir. 1998).

The prosecution history "consists of the complete record of the proceedings before the PTO [Patent Trade Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317 (citation omitted). The prosecution history has value because it "provides evidence of how the PTO and the inventor understood the patent." *Id.* (citation omitted). The prosecution history can clarify the meaning of the claim terms "by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* (citations omitted). Because the prosecution history reflects the ongoing negotiations between the PTO and the inventor, however, it "often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* (citations omitted).

Extrinsic evidence includes expert testimony, dictionaries, and learned treatises. *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1329 (Fed. Cir. 2007). The Federal Circuit has cautioned interpreting courts to be cautious in the use of extrinsic evidence. *Phillips¸* 415 F.3d at 1319. This is primarily because items of extrinsic evidence, such as technical dictionaries, are not created in the context of the invention. *Id.* at 1318-19. "Nonetheless, because extrinsic evidence can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean, it is permissible for the district court in its sound discretion to admit and use such evidence." *Id.*

at 1319. Most importantly, extrinsic evidence must be "considered in the context of the intrinsic evidence." *See id.*

**SPECIFIC CLAIMS DISPUTED**

With these standards in mind, the Court turns to the disputed claims. The Court will consider the indefiniteness argument related to "selectively" together with the proposed claim constructions. *See, e.g., Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1319 (Fed. Cir. 2008).

I.      *"Housing"*

*A. Sudden Valley's Proposed Construction*

The parties first dispute the proper construction of the term "housing," especially as used in its unmodified form in Claim 1. Sudden Valley proposes that "[t]he term 'housing' is properly construed using the definition provided in the '642 patent--a 'tubular body.'" (SVS Brief, ECF No. 50, at 7). Sudden Valley argues that "[t]he '642 Patent defines 'housing' as a 'tubular body' by using the two terms interchangeably." *Id.* In response, NPZ maintains that "tubular" is a separate modifier of "housing" used in some instances and that the unmodified use of "housing" should be differentiated from the modified use. (NPZ Response, ECF No. 56, at 2).

The Court rejects Sudden Valley's proposed construction. While the term "housing" is often used in place of "tubular housing," the two are not used interchangeably. In every instance in which "housing" is used instead of "tubular housing," a prior use of "tubular housing" has already limited the subject of the particular sentence, paragraph, or line of description. For instance, the description of the preferred embodiment begins, "The trap **10** of the present invention includes a *tubular body or housing* **12** which is closed at the rear end **14** and open at the front end **16**."[1] ('642 Patent col. 2, ll. 12-14 (emphasis added)). After that, there are several

---

[1] The parties agree that "housing" and "body" are equivalents of each other, and the Court also views the terms are equivalents.

uses of "housing" without the tubular modifier. *Id.* cols. 2-3 ("A spring **21** on the *housing* **12** biases the wire frame . . . The trigger **28** is pivotally mounted on a cross bar **30** on the outside of the *housing* **12**" (emphasis added)). But each of these unmodified uses of "housing" is merely a reference back to the earlier use of "tubular housing," which limited the subject of the paragraph. In other words, the term "tubular housing" can always be placed under the broader term "housing," and "housing" therefore can be properly used to encompass a "tubular housing." But a "housing" is not necessarily a "tubular housing." Where "housing" is used on its own and not in reference an earlier use of "tubular housing," it maintains a broader definition.

This understanding is supported by comparing Claim 1 to Claim 11. Claim 1 starts with an unmodified use of "housing." ('642 Patent col. 3, l. 53). It then repeats this unmodified use throughout the rest of the claim. *Id.* col. 3, ll. 54-67, col. 4, ll. 1-2. Claim 11, on the other hand, starts with a recitation of "tubular housing." *Id.* col. 4, l. 51. It then uses "housing" in its unmodified form throughout the rest of the claim instead of repeating "tubular housing." *Id.* col. 4, ll. 52-67, col. 5, ll. 1-7. Claim 1, then, starts with a broader understanding of "housing," and the subsequent uses of "housing" in its unmodified form refer to this broader understanding. Claim 11, though, begins with a narrower understanding by claiming a housing with the tubular modifier. The narrower use limits the subject of the entire claim, and each unmodified use of "housing" in that particular claim is narrowed accordingly. That one independent claim begins with the unmodified use of housing and the other begins with a modified use is a strong indication that the two are not equivalents. Reading "housing" and "tubular housing" as equivalents would essentially make the word "tubular" superfluous throughout the entire patent. *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1381 (Fed. Cir. 2006) (explaining that when comparing two independent claims, "claim differentiation takes on

relevance in the context of a claim construction that would render additional, or different, language in another independent claim superfluous").

Sudden Valley cites *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322 (Fed. Cir. 2009) and *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295 (Fed. Cir. 2004) in support of its proposed construction. There are, however, significant distinctions between the patents at issue in those cases and the '642 Patent. There were four patents at issue in *Edwards Lifesciences*, all of which related to "intraluminal grafts for treating aneurisms and occlusive diseases of the blood vessels without open surgery." *Id.* at 1324. The constructions of several terms within that patent were in dispute. *Id.* at 1325. The construction question most analogous to this case was whether "graft" necessarily meant "intraluminal graft" even though the patents contained uses of "graft" that were not preceded by an "intraluminal" modifier. *See id.* at 1328-1331. The *Edwards Lifesciences* court found that because "graft" and "intraluminal graft" were used interchangeably throughout the specification, the patentee had defined "graft" to mean "intraluminal graft." *Id.* at 1329.

While there are certainly strong similarities between the '642 Patent and the *Edwards Lifesciences* patents, there are two key distinctions that doom the analogy. The first is that, as noted above, "housing" is not used in the '642 Patent as an interchangeable equivalent of "tubular housing," but rather as shorthand description in various lines of description. The second distinction is that the common specification for the patents at issue in *Edwards Lifesciences* made clear that the patents were "directed to an alternative form of intraluminal graft which provides an alternative to the known grafts." (U.S. Patent No. 6,582,458). In other words, the main purpose of the *Edwards Lifesciences* patents was to create an intraluminal graft. Indeed, all of the *Edwards Lifesciences* patents were entitled, "Intraluminal Graft." (U.S. Patent Nos.

6,582,458; 6,613,073; 6,685,736; and 6,689158). The patents in *Edwards Lifesciences* therefore created a lens through which the court could only see an intraluminal graft when it examined the word "graft" in those patents. There is no similar interpretive lens created by the '642 patent. The primary purpose of the '642 patent was to create an animal trap with a two-way trigger that increases the chance of trapping an animal. ('642 Patent col. 1, ll. 32-34). The '642 Patent was distinguished from prior art by the inclusion of a workable two-way trigger. *See id*. col. 1, ll. 25-27, col. 3, ll. 54-55; Interview Summary, ECF No. 51-7). There is no indication that the shape of the housing is integral to the invention itself. While the preferred embodiment discloses an animal trap with a tubular housing, the tubular housing is not so fundamental to the invention that it would be appropriate to read the description as limiting the claims to animal traps with tubular housings.

There are also significant distinctions between the '642 Patent and the patent at issue in *Irdeto Access*. The *Irdeto Access* patent was "directed to a system for controlling the broadcast of digital information signals by using three layers of tiers of complementary encryption and decryption keys--'service keys,' 'group keys,' and 'box keys.'" *Id*. at 1296. A major dispute was whether the term "group" as used in the patent at issue could extend to all subscribers or was necessarily limited to a subset of all subscribers. *Id*. at 1300. Like the *Edwards Lifesciences* court, the *Irdeto Access* court found that because the patentee used the words "group" and "subset" as equivalents in the specification, the patentee had defined "group" to mean "subset." *Id*. at 1301.

As in the comparison of the '642 Patent to the *Edwards Lifesciences* patents, there are two major distinctions between the '642 Patent and the *Irdeto Access* patent. First, the patentee in *Irdeto Access* made clear to the patent examiner that, while "group key" did not have an

ordinary meaning in the art, the term was "very adequately described in the specification." *Id.* at 1300. NPZ did not give a similar indication regarding the importance of the specification. This is not to say that NPZ did not use "housing" idiosyncratically or that the specification should be given no weight. But there is no need, as there was in *Irdeto Access* based in part on the patentee's statement, to give more weight than would ordinarily be given to the specification. More significantly, "housing" and "tubular housing" were not so clearly used as equivalents in the '642 Patent as "group" and "subset" were used in the *Irdeto Access* patent. The *Irdeto Access* court found the "most telling" evidence that "group" and "subset" were equivalents to be a "passage characterizing the box address/box key pair as 'simply . . . another subscriber *subset (group).*" *Id.* at 1301 (emphasis in original). The position of "group" in a parenthetical next to "subset" is a very strong indication that the two terms are meant to be equivalents. Indeed, there seems to be no other appropriate interpretation of that phrase. The '642 patent contains no indication so strong as the one in the *Irdeto Access* patent that "housing" and "tubular housing" should be equated. The better reading in light of the whole '642 patent is, as explained above, that "housing" is often used as shorthand for "tubular housing" in particular descriptions.

In short, a person of ordinary skill in the art would not understand "housing" and "tubular housing," as used in the '642 Patent, to be equivalents.

### B. NPZ's Proposed Construction

NPZ proposes that the term "housing" should be construed to mean "something that covers or protects." (NPZ Brief, ECF No. 51, at 14). Specifically, NPZ contends that the housing is something that covers or protects "the trigger and bait used to attract the raccoon." (NPZ Response, ECF No. 56, at 4). In response, Sudden Valley argues that "NPZ's proposed construction is improper because it defines the term entirely functionally. Such a construction

would render the claim indefinite." (SVS Response, ECF No. 57, at 6 (citing *Holland Furniture Co. v. Perkins Glue Co.*, 277 U.S. 245, 256-57 (1928) ("That the patentee may not by claiming a patent on the result or function of a machine extend his patent to devices or mechanisms not described in the patent is well understood)). Sudden Valley also counters NPZ's proposed definition with the observation that "the specification and claims describe the housing as providing ***access*** to the bait, not covering or protecting it." (SVS Response at 6) (emphasis in original).

In their briefing, NPZ and Sudden Valley have presented a construction derived from the intrinsic evidence. First, a "housing" described in the '642 Patent must "cover or protect" at least the bait.[2] (NPZ Response at 4). From the perspective of an ordinary animal trapper, this would be a key feature of the invention because only if the bait is covered and protected could the trap be left outside unattended in inclement weather. And Sudden Valley has pointed out another of the key features of a "housing"-- that it provides "access to the bait." (SVS Response at 6). Without access to the bait, there would be nothing to induce the animal to trip the trigger. These two observations provide a starting point for a definition: a "housing" is "something that covers and protects the bait and that provides access to the bait."

In addition, Sudden Valley proposes the following definition of "tubular body," which it argued is the equivalent of "housing" in the '642 Patent: "A hollow cylindrical structure that serves as an enclosure." (SVS Brief at 8). For reasons explained in the previous section, it is inappropriate to read a "cylindrical" limitation into the unmodified use of "housing." There is, however, ample evidence in Claim 1, read in light of the other intrinsic evidence and in light of

---

[2] The Court is not convinced that "cover or protect" is the correct description of the relationship of the housing to the trigger. Because the preferred embodiment discloses a trigger that is at least partially outside of the housing, it would be inappropriate to understand the housing as covering or protecting the trigger.

the nature of the invention, that the term contemplates a "hollow enclosure." First, the bait could only be protected, which NPZ contends to be a key purpose of the housing, if it is placed in an enclosure. Unless the bait is in an enclosure, it could not be protected from, for example, falling rain or the resulting wet ground. Nor could the trap accomplish the purpose set out in the preamble of Claim 1, "catching an animal," unless the bait is placed in an enclosure. (*See* '642 Patent col. 3, ll. 51-67, col. 4, ll. 1-2). If the bait is not enclosed, an animal could simply approach the bait from either direction and easily avoid tripping the trigger. All of this evidence points to the necessity that a "housing" contemplated in Claim 1, even in its modified form, must be an enclosure.

After careful consideration of the intrinsic record and the arguments made by the parties, the Court therefore construes "housing" to mean "a hollow enclosure that covers and protects the bait and that provides access to the bait." Although the construction contains functional language, it does not contain inappropriate uses of functional language such that it makes the claim indefinite. *See Biosig Instruments, Inc. v. Nautilus, Inc.*, 715 F.3d 891, 903-04 (Fed. Cir. 2013).

## II.    *"Tubular"*

The parties' next disagreement is over the meaning and scope of "tubular." NPZ proposes that tubular be construed to mean "a hollow, elongated shaped structure." (NPZ Brief at 17). Sudden Valley proposes the slightly narrower construction, "[a] hollow cylindrical structure that serves as an enclosure." (SVS Brief at 8).[3] The difference between the two proposed constructions is that Sudden Valley's would encompass only "cylindrical" structures, while NPZ's does not include this limitation.

---

[3] Both parties refer to a structure in their proposed construction of "tubular." Because "tubular" is an adjective, there should be no structural language included in the construction.

Sudden Valley's proposed construction is the best understanding of "tubular" as it is used in the '642 Patent because it includes the "cylindrical" limitation. The primary evidence for this comes from the specification, which states that in the preferred embodiment there is a "U-shaped arm loop **20** extending through a pair slots [sic] **22** at the forward end **16** of the tube **12** so that lower end of the arm **20** is movable across the *diameter* of the tube." ('642 Patent col. 2, ll. 15-18 (emphasis added)). Unlike "housing," which was used in its unmodified form in an independent claim, there is no other use of "tubular" in the '642 Patent that would allow a person of ordinary skill in the art to think a tube is something other than a cylinder. Also, every drawing and every photograph of the invention that accompanies the '642 Patent shows a cylinder. ('642 Patent A0004-A0006, A0018-A0022). Taking all of this into account, a person of ordinary skill in the art would understand the term "tubular" in the '642 Patent to include a "cylindrical" limitation. The Court therefore construes "tubular" to mean "hollow and cylindrical."

III.      *"On"*

Sudden Valley proposes that the term "on"--as used in claims 1-5 and 11--should be construed as "positioned in contact with and supported by the housing/tubular body." (SVS Brief at 12). NPZ argues that this definition would "exclude the '642 patent's preferred embodiment from the claims" and that the term "on" should instead be construed to mean "connected to and supported by." (NPZ Brief at 21-22). The difference between the two constructions is that NPZ's would encompass indirect connections, while Sudden Valley's definition would encompass only direct connections. (SVS Brief at 13).

The Court notes first that the phrase "and supported by," which both parties include in their proposed constructions, should not be included in the construction of "on." That language appears to come from entry 1a of the first use of "on" in the Third Edition of Merriam-Webster's

Dictionary. The exemplary use of that definition is, "The book is *on* the table." *Id.* (emphasis added). The entry from which the "supported by" language comes thus contemplates one item resting upon another. But such a construction of "on" would exclude the preferred embodiment, which is unwarranted here. *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276 (Fed. Cir. 2008). For instance, Claim 1--the broadest claim in the patent--calls in part for "a latch on the housing [and] a trigger on the housing." ('642 Patent, col. 3, ll. 54, 57). The description of the preferred embodiment indicates that neither the latch nor the trigger is "supported by" the housing in the sense that a book resting on a table would be supported by the table. The latch is "pivotally mounted adjacent the front end" of the housing, which indicates that the latch is to be placed on some intermediate structure. *See id.* col. 2, ll. 24-25. "The trigger **28** is pivotally mounted on a cross bar **30** on the outside of the housing[,]" again noting the presence of an intermediate structure. *See id.* col. 2, ll. 31-33. Figure 1 corroborates the presence of intermediate support structures. *Id.* at A0002. Because doing so would exclude the preferred embodiment, it would be improper to include the "supported by" language in the construction of "on."

Sudden Valley's proposed construction would also exclude the preferred embodiment. Again, courts tasked with claim construction "normally do not interpret claim terms in a way that excludes embodiments disclosed in the specification." *Oatey*, 514 F.3d at 1276. Yet this is precisely what Sudden Valley requests the Court to do. Sudden Valley argues that the term "on" requires the subject to be in direct contact with its object. As noted previously, the latch and trigger both make direct contact with an intermediate support structure rather than the housing itself. Thus, neither would be considered to be "on the housing" if "on" requires direct contact with the housing, and the Court will not adopt Sudden Valley's proposed construction.

The Court instead adopts a reasonable construction derived from the intrinsic evidence that would cover the preferred embodiment: "connected to, either directly or by attachment to an intermediate structure that is directly connected to." This construction allows for the possibility of indirect contact and is the definition that best accounts for the apparent necessity of intermediate structures to connect the trigger and latch to the housing.[4] It also avoids the necessity of reading "housing" in an overly broad way, such that, for example, the intermediate structures indicated in the drawings and photographs would need to be defined as part of the housing.

IV.     *"Extending into the Housing"*

The parties next dispute the scope and meaning of the phrase "extending into the housing" used in Claims 2, 11, and 17 in relation to the restraint and trigger. NPZ proposes that the phrase be construed to mean "to continue into the housing." (NPZ Brief at 20). After initially proposing that the phrase be construed to mean "*stretching* in toward the inside of the housing[,]" (SVS Brief at 14-15) (emphasis added), Sudden Valley agreed that "to continue" would be an acceptable construction. (SVS Response at 13-14). Sudden Valley insists, however, that the key term to be construed is not "extending," but rather "into." (SVS Response at 13).

The Court finds that "extending" means "continuing." Sudden Valley's initial proposition that the term be construed to mean "stretching" is inappropriate. The word "stretching" itself is too ambiguous to be of any help as a definitional term. It also seems to imply some sort of

---

[4] Contrary to Sudden Valley's argument, the Court in adopting this definition has not redrafted a claim subject only to one reasonable construction so that the claim encompasses the preferred embodiment. *Cf. Chef America, Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1373 (Fed. Cir. 2004). That there are four entries--three with multiple subentries--for "on" in the dictionary from which Sudden Valley derives its proposed construction indicates that there is a multitude of reasonable constructions of that term. The Court has chosen a reasonable construction that accommodates the preferred embodiment. *Oatey*, 514 F.3d at 1277 ("At lease [sic] where claims can reasonably to interpreted to [sic] include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment").

elasticity. As NPZ points out, an elastic restraint would be completely ineffective for trapping a raccoon. (NPZ Response at 8). The Court therefore construes "extending" to mean "to continue" or "continuing."

As noted, however, Sudden Valley contends that the key term to be interpreted is "into." Under the plain meaning of "into," a subject must go inside an object. Here this means that the restraint or trigger must at least partially go inside the housing. This is the ordinary meaning of the word "into," and the drawings and pictures that accompany the patent show at least part of the trigger and restraint continuing to the inside of the housing. ('642 Patent A0004-A0006, A0018-A0022). The Court therefore construes the phrase "extending into the housing" to mean "continuing to the interior of the housing."

V.       *"Flat End" and "Flat Surface"*

The parties dispute the meaning and scope of "flat end" and "flat surface" as used in Claims 1, 5, 10-12, and 15. NPZ proposes that the terms "do not require further construction beyond the Court instructing the jury that the plain and ordinary meaning as used in the '642 patent should control."[5] (NPZ Brief at 11).[6] Sudden Valley proposes that "flat end" and "flat surface" should be understood to mean, "the surface of the latch above the notch." (SVS Brief at 18-21). Sudden Valley contends that this construction necessarily follows from an exchange between NPZ and the patent examiner in the prosecution history--that by making a change pursuant to a suggestion made by the examiner, "NPZ gave up any right to a different

---

[5] NPZ mentions this argument in passing in several other sections of its brief, but the "flat end" section is the only section in which NPZ does not propose a construction.

[6] Citing *Lava Trading, Inc. v. Sonic Trading Mgmt., LLC*, 445 F.3d 1348, NPZ also proposes that the Court does not need to construe the claims at all because Sudden Valley has not demonstrated that the terms are material to the dispute. (NPZ Brief at 10-11). The situation in *Lava Trading* was substantially different from the situation here and is not persuaded by this argument.

interpretation by amending the claims and agreeing with the Examiner's description." *Id.* at 18-20.

Sudden Valley is quite correct to note that patentees can sometimes disclaim meanings of a claim term by adopting particular construction during the prosecution history and that the prosecution history can sometimes illuminate the meaning of claim terms. *Elkay Mfg. Co. v. Ebco. Mfg. Co.*, 192 F.3d 973, 978 (1999). "To operate as a disclaimer, the statement in the prosecution history must be clear and unambiguous, and constitute a clear disavowal of scope." *Verizon Services Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1306 (Fed. Cir. 2007). But there is no such clear disavowal here, and the exchange from the prosecution history pointed to by Sudden Valley is not particularly illuminating.

The claims from NPZ's provisional application explained that a latch on the body engages with the trigger to lock the trap into a set position. (Application 12/773,303, ECF No. 51-3, at 8). The provisional claims did not, however, include a description of the engaging mechanism. *Id.* The patent examiner believed that without amendment the application could thus not overcome prior art. (Interview Summary, ECF No. 51-7). The examiner then explained that during their interview, "[t]he parties agreed that if Applicant amends the independent claims to more specifically define the latch including a notch (claim 2) and a flat engaging surface *above the notch* to engage the hook of the trigger, then the rejection over [the prior art] would likely be overcome." *Id.* (emphasis added). NPZ then "amended independent claims 1, 11 and 17 to provide that the latch has a flat surface or flat end which engages the trigger in the set position, and includes a notch, as suggested in the Examiner's Interview Summary." (Application Amendment, ECF No. 51-8, at 3). Based on this exchange, Sudden Valley asks the Court to construe "flat end" and "flat surface" as "the surface of the latch above the notch."

Such a conclusion would be inappropriate. The finalized version of the claim itself describes the location of the flat end not as "above the notch," but rather as "adjacent" the notch. ('642 Patent col. 3, ll. 54-55). While "above" could likely be construed as a limitation of "adjacent," there is no clear statement in the above exchange that would render such a limitation appropriate. The examiner's use of the word "above" in relation to the latch on an animal trap seems imprecise at best;[7] the examiner's statement, when read in conjunction with the provisional application, seems to be directed primarily at the inclusion of some explanation of the engaging mechanism; and NPZ's response focuses on providing such an explanation. Just as important as the ambiguity that pervades the exchange between NPZ and the examiner is that the prosecution history concludes with the examiner approving claims that use "adjacent" rather than "above." *Innova/Pure Water, Inc.*, 381 F.3d at 1116 ("a claim construction analysis must begin and remain centered on the claim language itself"). In short, there is nothing clear or compelling enough about the prosecution history to conclude that the construction of "flat end" should include an "above the notch" limitation.

The Court also rejects NPZ's argument because "flat end" and "flat surface" do not have so apparent a meaning that no construction is required. *See O2 Micro Intern. Ltd. v. Beyond Innovation Technology Co., Ltd.*, 521 F.3d 1351, 1361-62 (Fed. Cir. 2008). Instead, the Court thinks an adequate definition can be derived from the patent itself. Claim 1 calls in part for "a latch on the housing having a flat end and a notch adjacent the flat end." ('642 Patent col. 3, ll. 54-55). The flat end of the latch is engageable with the trigger such that it "hold[s] the trap in a set position[.]" *Id.* col. 3, ll. 58-60. A combination of these two portions of Claim 1 leads to a

---

[7] Indeed, as noted by Sudden Valley, to include "above" in the construction of "flat end" and "flat surface" would most likely render many of the claims indefinite and therefore invalid. (SVS Brief at 21-22).

construction of "flat end" and "flat surface": the terms "flat end" and "flat surface" refer to the "flat portion of the latch adjacent to the notch that engages the hook of the trigger."

## VI.     *"Selectively"*

The parties next dispute the scope and meaning of the term "selectively" as used in Claim 5. Sudden Valley argues that "selectively" is an indefinite term. (SVS Brief at 16-17). In support of this contention, Sudden Valley presents two theories: (1) that the term is indefinite because its meaning is not apparent from the patent; and (2) that the term is indefinite because it impermissibly covers both an apparatus and a method of use. *Id.* NPZ argues in its reply brief that both of Sudden Valley's arguments lack merit and proposes that "selectively" be construed as "choose to engage the restraint."[8] (NPZ Response at 13-14).

The Federal Circuit has rejected a broad concept of indefiniteness, under which "all but the clearest claim construction issues could be regarded as giving rise to invalidating indefiniteness in claims at issue." *Exxon*, 265 F.3d at 1375. Instead, the Federal Circuit has stated that "[i]f the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds." *Id.*

The Court rejects Sudden Valley's argument that "selectively" is indefinite because it is not adequately described in the patent and adopts NPZ's proposed construction, "choose to

---

[8] In its opening brief, NPZ includes only a general argument that Sudden Valley has failed to prove any terms in the patent are insolubly ambiguous. (NPZ Brief at 23-24). Citing *Jenkins v. Winter*, 540 F.3d 742, 751 (8th Cir. 2008), Sudden Valley argues that NPZ waived its right to propose a construction of the term "selectively" by failing to include a proposed construction in its opening brief. (SVS Response at 3-4). But in a *Markman* setting, "the trial judge has an independent obligation to determine the meaning of the claims, notwithstanding the views asserted by the adversary parties." *Exxon Chemical Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1555 (Fed. Cir. 1995). In performing that obligation, the Court will consider all proposed constructions in an effort to discern the correct one.

engage the restraint." NPZ is correct to point to the following portion of the description as providing context for understanding the term:

> An elongated latch **24** is pivotally mounted adjacent the front end **16** of the tubular housing **12** so as to be movable between a first position engaging the wire frame **18** to hold the wire frame **18** and arm **20** in the set position, and a second position disengaged from the wire frame **18** so as to release the frame **18** and arm **20** from the set position. In the set position, the latch **24** overlies the wire frame **18** and is secured by a hook **26** on the upper end of the trigger **28** of the trap **10**.

('642 Patent col. 2, ll. 23-31). In short, the patent contains a description of an animal trap with the capacity to be in either a set or unset position. Absent from the patent entirely is a description of an automatic or involuntary means of setting the trap. It is reasonable to conclude that a person of ordinary skill in the art would understand that he or she would need to set the trap manually and that the term "selectively" as used in Claim 5 is simply a shorthand explanation of that fact. There is therefore no basis for a finding of indefiniteness based on the lack of an adequate definition. NPZ's proposed construction, "choose to engage the restraint," is derived from the patent itself and appropriately defines "selectively" as used in Claim 5.

The Court also rejects Sudden Valley's proposition that "selectively" is invalid for indefiniteness because it claims "both apparatus and method of use." (SVS Brief at 17 (citing *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005)). The patent at issue in *IPXL Holdings* was "directed to a system for executing electronic financial transactions[.]" *IPXL Holdings*, 430 F.3d at 1378-79. Claim 25 of that patent read:

> The *system of claim 2* [including an input means] wherein the predicted transaction information comprises both a transaction type and transaction parameters associated with that transaction type, and *the user uses the input means* to either change the predicted transaction information or accept the displayed transaction type and transaction parameters.

*Id.* at 1384 (emphasis in original). The *IPXL Holdings* court determined that Claim 25 "recite[d] both a system and the method for using that system[.]" *Id.* This mixture of system and method created a danger that "a manufacturer or seller of the claimed apparatus would not know from the claim whether it might also be liable for contributory infringement because a buyer or user of the apparatus later performs the claimed method of using the apparatus." *Id.* In other words, the scope of the claimed invention would be unclear to a person of ordinary skill in the art. *Id.*

There is no danger of such confusion here. It is true that "selectively," as defined above, is a functional term. But it is used in Claim 5 for the purpose of providing context so that a person of ordinary skill in the art can better understand what is meant by "latch." This is an appropriate use of functional language in an apparatus claim. *Biosig Instruments*, 715 F.3d at 903-04. There is no danger that a person of ordinary skill in the art would think Claim 5 actually covers a method of engaging the latch and trigger to set the raccoon trap. This is therefore not an instance where the use of functional language in an apparatus claim makes the scope of the claim indefinite.

## SUMMARY OF ADOPTED CONSTRUCTIONS

In summary, the Court has adopted the following constructions for the disputed terms:

1. **"Housing"** means "a hollow enclosure that covers and protects the bait and that provides access to the bait."

2. **"Tubular"** means "hollow and cylindrical."

3. **"On"** means "connected to, either directly or by attachment to an intermediate structure that is directly connected to."

4. **"Extending into the housing"** means "continuing to the interior of the housing."

5. **"Flat End" and "Flat Surface"** mean the "flat portion of the latch adjacent to the notch that engages the hook of the trigger."

6. **"Selectively"** is not indefinite and means "choose to engage the restraint."


   Accordingly,

   **IT IS HEREBY ORDERED** that the disputed terms in U.S. Patent No. 8,230,642 will be construed as set forth in this Memorandum and Order.


Dated this 7th day of March, 2014.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE
